Mr. Clerk, will you call the next case, please? 314-0119, in re Marriage of Sheeran Dowd, affiliated by Howard Levine and Michael Dowd, powered by Gregory Jumbach. Mr. Jumbach. Thank you. May it please the Court, Mr. Levine. Clerk. As the Clerk announced, my name is Gregory Jumbach of Reach Jumbach and Stoll, LLP, and we represent Mr. Michael Dowd in this appeal. I'm present with our associate, Timothy Reed. This case stems from, again, back before you all, issues relative to a judgment for dissolution of marriage. This Court heard arguments previously and rendered a decision affirming Judge Barron's original trial court decision in entry of a judgment for dissolution of marriage. And you're not going to revisit that ruling today? No. What are you appealing? We are appealing the trial court's determination that the bonuses, which my client, Mr. Dowd, was to pay between $50,000 up to $100,000, as you recall, there's two different provisions. Why didn't you raise that issue in the first appeal? The first appeal was never raised by him. We did not appeal at all. The first judgment for dissolution of marriage is completely silent. Why didn't you cross appeal and say the order was ambivalent? We don't know how to calculate this. Part of the reason why I respectfully disagree, I don't believe that we needed to, is that at that point in time, when you look at the, and as we state within our brief, the manner in which everyone had acted in the trial court, and even Judge Barron cut off, for lack of a better term, Mr. Levine during cross-examination of our client, specifically going at one of his bonus checks, was that, don't beat a dead horse, there's $9,000, she's going to get her share. And the $9,000 that was referred to, it's clear in the record that's obviously contained on this appeal, but was dealt with in the first appeal, was a net number that he had actually received from his bonuses. Additionally, there is, in essence, a 501 injunctive order, though there was never a petition for injunctive relief, but there was an agreed order that any monies that either party were to receive for bonus income must be placed into an interest-bearing account and not to be touched by either party. So there had never been an issue or an argument, frankly, until after the decision came out, but before the mandate was issued, as I recall the timeline, as to whether or not the issue was gross versus net. There had been bonuses received each year that the case was pending before the trial court, and never had there been an argument as to are we divvying up the gross or the net. So are you appealing the fact that he was not found incontent? No, we're not appealing the fact that he was not found incontent. The Judge Barrett, interpreting... He said you're not incontent. He said you're not incontent. Why are you here? We are here because at that point in time, Judge Barrett went on to state that the biggest argument that occurred between counsel and the court, and even the court, I don't want to say he reconsidered himself, but took the matter under advisement, after the first hearing on October 24th of 2013, said, I believe it's not gross. Then after further argument... But you're not incontent. Correct. He didn't make that ultimate decision until October 31st of 2013. So the entire argument that took place on October 24th of 2013, besides, I believe, maybe three lines of transcript, dealt with gross versus net. Okay, let's look at it procedurally, okay? At the time it became an issue, and let's, you know, you were saying more recently, okay? Don't go over that old water. Okay. Was Appley's only, or how do you get that clarification before the court? Are you saying that a rule that showed cause is the appropriate vehicle to do that? That was the vehicle which the Appley chose. Yes. And so we had no, well, ostensibly... So now I have a question, okay? Your client is not found incontent, correct? Correct. But then we have the trial judge going on and saying, oh no, by the way, so there's no confusion here, this is what this language means. Correct. Okay. And that's really all your appeal? Correct. Was that determination? Correct. Now the question is, if you disagreed with that, what could you have done other than bring an appeal? Frankly, I have no idea. I mean, it would be no different, and since receiving this court's letter last week and the sweat and panic that ensued thereafter in reviewing the notices of appeal, the timelines of everything, the massive sweat that came through all four of the attorneys in our office, there's nothing to do. It would be no different than, and the only thing I can analogize it to well is, a petition for rule of show cause is filed for non-payment of child support. The court says, I believe that you're not content because you deducted your 401k and you shouldn't have, and you made an honest mistake. So you're not in contempt, but your arrearages are $15,000. But you believe, or your attorney believes, that the math reflects that you're only in arrearages of $10,000. If you can't appeal that decision where you quote-unquote won because you're not held in contempt, but you believe that the arrearages are $5,000 off in my hypothetical, you're forestalled from an appeal. If all you get is that you won because you're not in contempt. Okay, so in this case the judge says you're not in contempt, but did not give a reason, correct? I don't recall. I'm worried that the notice of appeal was not filed within 30 days of the final order finding your client not in contempt, and that the motion to reconsider doesn't necessarily stay. Your requirement to file the notice of appeal within the next 30 days. I believe that the motion to reconsider, because it is a valid post-judgment motion or 1203, does stay the contempt proceeding. Because again, not only was it an issue of contempt or not contempt, there was also an issue of what's the arrearage. And Judge Barrett actually even says, I believe, I'm sorry, I'm almost positive it's in the October 31, 2013 transcript. The two of you can figure out the math, and after 30 postings of practicing together, Mr. Levine and Mr. Rich both say we'll probably agree on something for once. That's just the reality of, under these circumstances, I guess the flip side would be if the 1203 motion can't be directed at that, then what is it really being directed at? Because it's not, or are we then forced off of even approaching the 1203 motion, the only thing you can file once the judge determines that you're not in contempt, but then determines that it's net versus gross, under, I guess, kind of a theory of revestiture. Well, can't you force the issue by just not complying with the judge's order, not paying the bonus on the gross rather than the net, and then the next contempt proceeding is where? I think that may be one way you could go. But the practical response to that is also, could you test the contempt, but then you're also testing 508B, and you're advising your client to, or potentially your client is choosing to, not do something, and then there would be just to test the contempt aspect of it. And respectfully, I believe that the 1203 motion was the appropriate way to go because of the manner, and I think you really need to, reviewing the transcript, again, and Mr. Levine and I have discussed this previously, there was next to no language or no argument, I should say, between the parties as to, is Mr. Dowd in contempt? That really was not the issue. The issue is, judge, tell us if it's gross versus net. And then to say, well, let's just file another contempt proceeding, one, it's not judicially accountable. It's completely uneconomical, especially for parties who are getting to that point where they're trying to retire and looking forward to retirement, which is part of the reason why you should receive the bonus money going back to the first appeal anyway. You've done a good job of answering my concerns. If you can't tell, they're my concerns about the jurisdictional issue, and I don't want to propose you from getting to that. Thank you. I appreciate that, Justice. In terms of the remainder of the merits, as we point out, and this Court has stated in Garcia v. Gutierrez, which is 331-3127, it's a third district case from 2002, when there's an ambiguity, and nobody disputes the fact, in terms of the ability of the appellant, that it's a de novo standard of review, that looking back at the transcript of the proceedings and the manner in which the parties acted is the best indicator as to determining what the court intended in its judgment. And as even stated in this Court's opinion on the first appeal, the goal of, in Judge Barron's goal, and he stated it pretty clearly, was to incentivize our client, Mr. Dowd, to work harder to make more money, so that he's paying, in essence, or he's receiving more at the end of the day than he would, and to keep him working longer. Using... Is that a reason under the IMDMA? I don't know if it's a reason under the IMDMA, but I think it's a practical reality, from a practitioner's standpoint. I can tell you, Justice Holder, that there are plenty of people who may pull the plug a little bit earlier, if it means that they don't have to cut the next check, in terms of their employment. And that's their decision? I'm sorry? That's their decision. It is their decision. But to keep somebody perhaps working a year or two longer, by them getting to keep more of their bonus money as they go, after it is a fairly decent-length marriage, it's a fairly decent-sized estate that was divided. So to divide those, and to try to quote-unquote recoup, for both Mrs. Dowd, because that's why she was awarded the 6,100 in the base maintenance, plus which the court found met her reasonable needs, then to go even further on the bonus monies, was allowing everybody to keep working, and she would obviously receive maintenance. So if Barron becomes a financial planner, okay, fine. There are many trial judges who I'd say do have that concern. Unfortunately, yes. So when we review also the temporary relief orders, in terms of what we're splitting up, and what we're splitting up into the net versus the gross, and we're taking into account Judge Barron's desire to keep Mr. Dowd incentivized, to continue to work, under the gross versus net, if you accept the gross, and the math is within our brief at page 19, if you accept the gross calculation, on a $100,000 bonus, he's paying over $35,000, and receiving himself only $42,000, if it's a $100,000 bonus, if you take into account the tax calculations. The one thing, the words which Judge Barrett used, when rendering his decision on October 31st of 2013, was, I'm taking into account the tax consequences. And while under an initial determination, that's appropriate, at that point in time, Judge Barrett was not making an initial determination of maintenance, which would have been an abuse of discretion on appeal. Rather, he was interpreting Judge Barron's decision, which is the de novo or the question of law issue, which brings us back here, unfortunately for both parties perhaps, to the appellate court. Because what we are pointing out, and between the case law, as well as everything, in terms of Mr. Levine filed a petition for rule of show cause on behalf of his client in 2011, excuse me, 2012, when the case was still on appeal, arguing that it's a gross versus net, and give us the net check, give us the gross check. And he didn't question our calculations, or our client's calculations, at that point in time, as to what he had paid Mrs. Dowd for that 2012 bonus. It was March of 2012. So, when we're dealing with interpreting what Judge Barron was trying to get to, in terms of the incentivization, and the fact that the taxation was never brought up, wasn't raised on appeal, the first time around, and wasn't frankly discussed by anyone, to render the decision interpreting the judgment, not based upon Judge Barron's own statement during cross-examination, don't beat the dead horse. He's got $9,000. She's going to get her share. He's got $9,000, and we get back to the first part of our appeal, of Sir's definition of receive, is to come into possession of. He's got $9,000. That's the net of what he received. She's going to get, ostensibly, her $4,500 of that portion. So, everything that dealt with, all the language, all the orders, and even the monies that were held in our trust account, pursuant to an order, were all dealt with in net numbers. Not until the 2013 Petition for Rules of Cause, after the first decision in this case, was rendered by this court, and the mandate came down, does it say, does anyone, Sharon Dowd, her attorney, or us, ever even address the fact that, well, no, no, no, this should have been gross the entire time, not net. And when you do the math on it, it's completely, it demonstrates how little our client would receive between having to receive a $50,000 bonus, if that was the gross amount, paying Mrs. Dowd $25,000, being in a 28% tax break for federal, I guess three points, at the time, the argument 5% today, 3.75% of state tax, and the only other thing that was ever withheld was 1.45% of Medicare. Mr. Levine's question during the trial even said, FICA, that's OK. Federal tax, that's OK. State tax, that's OK. What they were interested in was making sure that the bonus wasn't being divided after my client had put into a 401k, if there was a pension contribution, or some other deduction from that bonus money that wouldn't have gone to Mrs. Dowd that should have been included. Thank you very much. Even Judge Barrett, when he heard the case on October 24th of 2013, stated, this would be a different issue if you're talking about 401k or you're talking about him messing with deductions, but I'm not hearing any of that. And there was none of that. So it plainly gets back to the fact that the issue of double taxation, which is ultimately what he rendered his decision based upon, when you look at the transcripts of October 31st, 2013, double taxation wasn't an issue. Judge Barrett didn't deal with the issue of double taxation, so that's why we now have to look at what did Judge Barrett look to and what was his intent in entering the judgment for dissolution of marriage with the maintenance provisions which he included in that judgment. And it was incentivization of our client to continue to work and work hard to earn those bonuses. Paying off of the gross and receiving roughly a third of what your bonuses wind up being after taxes is hardly incentivization to continue to work. And while we may disagree of trial judges being financial planners, under your example, and unfortunately it does happen every single day for good, bad, or indifferent, it's not the issue here, but they do take those things into consideration. And what we're to look at, because this is de novo review, is what's the intent. And the intent of the parties is clearly demonstrated pre-decree. It's clearly demonstrated, even within the letters which are attached in our supplemental appendix starting at page 22. And even Mr. Levine's own cross-examination during trial, then Judge Barron's statements during the motion to reconsider hearing, it's incentivization, not maximizing necessarily the tax consequences of Mrs. Dow. So those are the things that we have to take into consideration when rendering the decision as to net versus gross in terms of the bonus. Okay, let's deal with incentivization. Incentivization says, up to a certain limit, the split is going to be what? 50, it's after the, $50,001 to $100,000, she receives 20%. But prior to that she receives 50. Correct. Isn't that just incentive? That's a scale of incentivization. Does it answer the gross net issue? It doesn't answer the gross net issue at all, because especially, if you look at our brief again, I'm sorry, it's page 19 in our brief, since I'm running out of time, we go through the actual math of what he receives on $100,000, the net 65, then he has to pay the tax, and no one ever disputed our tax calculations in the trial court, not Mr. Levine and not the judge, in terms of he would wind up receiving in net on a roughly $100,000 bonus, $42,000, meanwhile he'd be paying over $65,000. I'm sorry, $35,000. $35,000, my apologies. So the incentivization is extremely minimized if you're going off the net. From a mathematical calculation, you're saying that the excess, the $50,001 excess, up to $100,000, because of tax consequences really becomes the same split as under $50,000. Correct, in essence, it makes it a little bit worse almost. That destroys your, so that there's, that mathematical calculation would destroy the incentivization that Judge Barrett seems so important. It largely does. And again, we did it not only within, you can see based upon the letters in the 2011 petition for rule while the case was on appeal, as well as the calculations contained within our brief that were argued by Mr. Reach in the trial court, the actual math comes down, and it breaks down that this doubt almost winds up receiving well more than the, I guess, 70% of the $100,000 if you want to look at it that way, in terms of versus how he has to pay it off of his gross, versus paying it off of his math. And it's just, the incentivization is exceptionally minimized, we would argue. And that's the issue that should be reviewed by Judge Barrett when he was reviewing the issue. Obviously, it's unfortunate that Judge Barrett retired. Unfortunate for us. The day after our mandate issued, he retired. I didn't realize it was quite that close. June 21st, I believe. I think it was June 21st. He had some vacation days to exercise, so he was gone a little bit earlier. So, Justice, we respectfully request that you reverse Judge Barrett's decision, when he leaves on our final call, and find that the bonuses to be paid should have been paid off of the net, rather than the gross. If there's no other questions. Thank you. Thank you very much. Goodbye. Good morning, Justice. I'm Howard Levine from Levine, Wittenberg, Sugar and Shots, and I represent Sharon Dowd as the appellee in this appeal. I tried the case. I did the first appeal. I'm back as the appellee on the second appeal. And I argued before Judge Barrett the interpretation argument of the judgment. It was always my understanding, after Judge Barrett rendered his decision, that I had asked for equalization of income. Without going into more detail, the decision was 50% of his bonus, up to $50,000, went to Mrs. Dowd, and 20% of the next $50,000 went to Mrs. Dowd. I argued, and I think it's illogical, that it has to come off gross. Maintenance is deductible by Mr. Dowd, taxable to Mrs. Dowd. So if you take the example, on the first $50,000, she would get $25,000, he would get $25,000. She would pay tax on the $25,000, and he would deduct the $25,000. On the next $50,000, she got 20%, which was $10,000. He would deduct the $10,000. She would pay tax on the $10,000. So the most equitable way to handle maintenance always is off the gross. I think that's what Judge Barrett meant. And frankly, he's greatly incentivized because he had bonuses of over $100,000 where he paid her nothing. He could make as much money as he wanted to, or as he could possibly be paid. He had a very, very good job. I think he was the CEO of a liquor distributing company where he could get a $500,000 bonus. My client would only get what she gets out of the first $50,000 and the next $20,000. I, in fact, when I appealed it the first time, I said I thought that was inequitable given the length of the marriage, given the distribution of marital property, and given the ability of both parties. So the simplest way to do it, and the way that I argued to Judge Barrett is the same thing. If he took the taxes off the top and paid them and then paid her, then she would still pay tax on less money. The only fair way to divide the bonuses was he gets the first $25,000, she gets the first $25,000, he gets the next $40,000, she gets the next $10,000. The taxes are paid by each of them in an appropriate manner. He deducts the maintenance that he pays her, so in essence his tax liability is lessened because he gets a deduction for the money he paid. Over the $100,000, it's all his. I argued this in front of Judge Barrett. Barrett, second judge. He took it under advisement. He then ruled a week later. Counsel filed a motion to reconsider. We re-argued it again in front of him. I gave the same argument I'm giving to you that the easiest way to compute the bonus income he gets $100,000, she gets $50,000, he gets $50,000, I'm sorry, she gets $25,000, he gets $25,000, the next he gets $40,000, she gets $10,000, she pays tax on the money that she gets, he deducts. Barrett believed that was right. Of course, we couldn't go back to Judge Barrett because he retired before the decision could be made. We would have done this earlier, but we couldn't because the first case was still before this court and taken under advisement and we were waiting for the ruling and the mandate because otherwise, who knew you could have reversed the whole issue? In your first decision, if you read it, there's a portion that tells you that she gets exactly what I'm suggesting she gets. I don't see any other way that you can... We were asked to construe net versus gross or define what net means. I'm sorry, Justice. We were not asked to construe or consider an issue of net versus gross or what net means, what net is. I agree, but in the first decision, there's a portion in which I think... I recognize that. Okay. All right. Frankly, that's my argument. I don't think I need to argue any further. The lines are drawn. The decision was made. It certainly wasn't an abuse of discretion by Judge Barrett when he made the decision he made. Thank you. Any other questions? Thank you, Mr. Levine. We'll come back in a little while. I just want to really follow up on some of the last actually words that Mr. Levine used. It's not an abuse of discretion, but that's not the standard, and that's not what you're reviewing. They agreed within their briefs, and I think it's pretty manifest, that this is a de novo issue because it's the interpretation of the trial court's order. There's no question that that is a de novo review. And, Justice Wright, you're correct. I believe you wrote the opinion on the first decision, if I remember correctly. You haven't referred to it as a well-written opinion, but you are right. If you looked at the trial court transcripts, I'm sure that I did. Actually, I remember, it was probably the last time I was out here, and it was the day of the flooding, and we almost barely didn't get here. However, when you look at it, there is no mention of net versus gross. So the only thing, again, that we can do is refer back to how the parties acted in the manner in which Judge Barron himself stated during the motion to reconsider hearing, and when he cut off Mr. Levine during an objection during the trial court, don't beat the dead horse, she's going to get her portion of the nine. The nine was a net number. It's what he had already had in his bank account. That's what he was questioning and cross-examining my client on, the money that's in his bank account. That's net, not gross. The letters that are contained within the appendix on the 2011 petition for rule, again, starting, I believe, is it our supplemental appendix at page 821, the question is the net versus the gross, only to make sure he's not taking out erroneous deductions. Judge Barron stated, if he's doing that, that's a totally different story. When Mr. Levine questions him, it's again, you're taking out FICA, that's okay, you're taking out state tax, that's okay, you're taking out federal tax, that's okay. When did that happen? That was during the trial. Before the appeal. Correct. So, and again, before the appeal, and we were talking about what was Judge Barron's, in essence, logic or thinking at the time that he entered the judgment, because we're interpreting his judgment, is incentivization, and Mr. Dowdy continued to work. Coupled with, the next step of the analysis under Garcia versus Gutierrez, is how the parties are acting in the part of the temporary relief orders, which again, are pre-appeal, I understand that, but that's what we have to look to when we're not construing the order, or excuse me, the judgment, because the judge is no longer present. So we have to focus on what Judge Barrett's job was, and that is, he had to read an order that did not include gross or net. It was silent. Correct. Isn't that what we're reviewing? To an extent, yes, but it's also what Judge Barrett should have taken into consideration, and there's no basis in anything. In other words, it's analogous to legislative history. Yes, I would say it is. Looking at the transcripts of these other proceedings, that ultimately led to this written order by Judge Barrett. Correct. And that's your argument. And if you look at that history, you're saying there's support for net as opposed to gross. Absolutely. And that's basically up to you. Because of the statement of Barrett that cutting an attorney off with impatience apparently, which is well known, he used the figure 9,000, which was a net figure. Yes. And that apparently upon examination by opposing him, by Mr. Levine, said, okay, how did you get to that figure? Well, you took off this, you took off that, you took off that. And in his statement of okay, you're trying to say it means approval. Not only that, but he also took into consideration what the parties had been doing before that. The temporary relief orders are to deposit the bonuses so that they can be divided into an account in both parties' name with no withdrawals unless by court order. Everything was always done off of the net. Well, let's look at that deposit. Okay. The deposit would have been net. But does that necessarily mean that that means gross is an owed? Or is it the fact that the check is for X amount because somebody else took it out? Well, ultimately, the record is in essence silent. That's right. On to that. So then we're trying to interpret and if all the actions were to take what you receive, because that's also what the judgment says, the bonuses that you receive. Yeah, but that doesn't answer the question. I don't disagree, but it's part of my argument. I understand. That it may not necessarily answer the question, but it's some of the best indicators that we could have. Right. And I don't disagree that the judgment could have been drafted and or dealt with better, but that doesn't change the fact that what we're here to do now is try to determine what the intent is. And we're requesting that you find that that intent must be paid up in that regimen. Can I give you a hypothetical? Yes, please. That probably isn't fair to you, but let's say that it's decided there isn't jurisdiction and it goes back and another rule to show cause is in the works. What's the likelihood of getting some sort of an agreement in the interest of judicial economy or lawyer economy as to what Judge Barron's order meant? I would have to say, and Mr. Berlant and I have been here on other cases where we're the trial attorneys as well, so actually it's probably not completely unfair. When you're dealing with people in the position of the decision of marriage, and I'm talking the reform order of the parties, and the contentiousness of the fact that we're now here on second appeal, I would say that it's probably slim because each party has the ability to say, well, I won the first time or I won the second time. And I think getting down to that agreement becomes manifestly more difficult. If, hypothetically, there is no jurisdiction and the appeal ends up being dismissed and another rule to show cause is forthcoming, will you be making the same arguments in the trial court that you've made here? I would presume so. I've been only the appellate counsel on this one and stepping in, pinch-hitting mostly Mr. Reed, my partner, has been the trial counsel, but I would say that we're pretty good consultants. So you'd get another bite at the apple? You could potentially get another bite at the apple that way, but that won't change the fact that on at least two very large bonuses, which Mr. Dodd received, he would be without recourse. I think Justice Holder, if you were of opinion referring to the trial judge in the Dust case, which is the only case that I can find that deals with that last sentence of 303A2, I believe your opinion is that it reflects the fact that the judge said that for the plaintiff's counsel not to show up, he's, quote, S.O.L. That's how he referred to it in his opinion and I don't know if that's the trial judge's actual words, but that's exactly what Mr. Dodd would be if there was another petition for rule under your hypothetical justice right, is that he's S.O.L. on what could be up to $15,000, $20,000 per year of monies that he would have been paid. So I understand where the jurisdictional question comes from. Thank you for answering my question. You're welcome. Just as a question, because not all of us have the record, although they're much more accessible now, electronic filing, but there's no other proceedings pending in this action at the time this ruling by Judge Barrett was made. I mean, there's not, is there any other? There were issues whether or not Mrs. Dodd could be entitled to enter a condominium owned by the Douds and Judge Chainstead in Arizona to do an accounting of property within there. Those were the, and then a motion to reduce the sale price on the marital residence. If I remember correctly, those were all resolved by agreement. Ultimately, I think Judge Barrett granted our motion, dismissed, denied her access to the Arizona condo to do the inventory and then also the house I think I actually sold now, so that became kind of a non-issue, I believe. So there's nothing outstanding going on at this point? Now there is. Okay. I mean, I don't know how much you'd like me to touch on that. No, we're not. I assume not, but if there's any questions. All right. Thank you very much. Thank you. Thank you both for your argument today. We will take this matter under advisement with a written decision within a short day. We'll now take a short recess for a moment.